**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| KERRY LOY and FRANK BLUMEYER, JR., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 4:19-CV-00184 JAR |
| | ) |
| BMW OF NORTH AMERICA and | ) |
| BAVARIAN MOTOR WORKS[1], | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant BMW of North America, LLC ("BMW")'s

Motion for Summary Judgment (Doc. No. 118) and Motion to Exclude the Opinions and

Testimony of Plaintiffs' Expert Darren Manzari (Doc. No. 119). The motions are fully briefed and

ready for disposition. On June 15, 2022, Plaintiff Kerry Loy and Defendant BMW stipulated to

dismissal of his claims with prejudice. (Doc. Nos. 152, 153). Plaintiff Frank Blumeyer, Jr.

("Blumeyer")'s claims remain pending.

**I.       Background**

Blumeyer purchased a new 2013 BMW 750li on October 9, 2012. The general nature of

his claim is that his vehicle's N63 engine had a defect that caused it to burn an excessive amount

of engine oil and that BMW was aware of this defect, failed to disclose it, and failed to repair it as

required by warranty. Blumeyer asserts four causes of action against BMW: (1) breach of express

and implied warranties under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2310,

et seq.; (2) breach of the implied warranty of merchantability under the MMWA and Mo. Rev.

---

[1] The Court notes Bavarian Motor Works has neither been served nor entered an appearance in this matter.

Stat. § 400.2-314 (2019); (3) breach of express warranties under Mo. Rev. Stat. § 400.2-313 (2019); and (4) violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 400.010, et seq.

BMW initially sought dismissal of Plaintiffs' claims for lack of subject matter jurisdiction, arguing that the claims did not meet the $50,000 amount in controversy requirement under the MMWA. This Court denied BMW's motion. BMW then moved to dismiss Plaintiffs' claims as time-barred based on the applicable statutes of limitations. The Court again denied BMW's motion. BMW now moves for summary judgment and to exclude the opinions and testimony of his expert, Darren Manzari.

## II. BMW's motion to exclude expert testimony and opinions of Darren Manzari

Plaintiffs retained Darren Manzari to opine on the problems experienced by their vehicles, with specific reference to excessive oil consumption. BMW does not dispute Manzari's qualifications.[2] Indeed, courts in related cases have found Manzari qualified to testify as an expert concerning matters of automotive mechanics, engineering, diagnostics, and repair. See, e.g., Bryant v. BMW of North America LLC, No. 19-CV-0050-BHL, 2022 WL 420874, at *3 (E.D. Wisc. Feb. 11, 2022); Carroll v. BMW of North America LLC, 553 F. Supp. 3d 588, 608 (S.D. Ind. 2021). Most notably, Manzari has experience working with the BMW N63 engines that are

---

[2] Manzari has worked in the auto industry for 35 years. (First Manzari Report, Doc. No. 119-2 at ¶ 1). He has an Associate of Applied Science Degree in Automotive Engineering, and he has held a certification from the National Institute of Automotive Service Excellence as a Certified Master Automotive Technician for over 25 years. (Id. at ¶¶ 3, 10). He owned and operated three automotive diagnostic and repair facilities for over 15 years. (Id. at ¶¶ 4, 5). He operates a training and consulting business through which he provides technical training to and consults with colleges, Original Equipment Manufacturer (OEM) dealerships, and aftermarket facilities. (Id. at ¶ 7). His business has done work in about a dozen countries for at least 23 OEM dealers representing at least 24 manufacturers, including BMW. (Id. at ¶ 9). Manzari holds the following certifications: Automotive Service Excellence (ASE) L1 Automotive Advanced Engine Performance; ASE A9 Light Vehicle Diesel Engines; and ASE L3 Light Duty Hybrid/Electric Vehicle. (Manzari CV, Doc. No. 123-3).

the subject of this suit. Rather, BMW moves to exclude Manzari's opinions and testimony on the grounds that the opinions expressed in his expert reports are neither reliable nor relevant under the test established by Daubert v. Merrell Down Pharmaceuticals, Inc., 509 U.S. 579 (1993).

### A.    Legal standard

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. A district court acts as a "gatekeeper" when screening expert testimony for relevance and reliability. Daubert, 509 U.S. at 590-93; Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012). To satisfy the reliability requirement, the party offering the expert testimony "must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." Barrett v. Rhodia, Inc., 606 F.3d 975, 980 (8th Cir. 2010) (quoting Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006)). To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue. Id.

The Court in Daubert emphasized that the inquiry required by FRE 702 is intended to be flexible. 509 U.S. at 594. The Daubert analysis was extended to all expert testimony, as opposed to only "scientific" testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 135, 147 (1999). Due to the liberalization of expert testimony admission standards signaled by Daubert and its progeny, and the codification of this trend by FRE 702, the Eighth Circuit has held that expert testimony should be liberally admitted. Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 562 (8th Cir. 2014) (citing United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011) (doubts about usefulness of expert testimony are resolved in favor of admissibility)); Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (expert testimony should be admitted if it advances the trier of fact's understanding "to any degree"); Lauzon v. Senco Prod., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (FRE 702 "clearly is one of admissibility rather than exclusion") (quotations

omitted). As long as the expert testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded at the outset. Id. (citing Daubert, 509 U.S. at 596). Exclusion of an expert opinion is proper "only if it is so fundamentally unsupported that it can offer no assistance to the jury." Wood v. Minnesota Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (citation and quotation marks omitted).

### B.    Manzari's opinions

Manzari's first report was issued on June 22, 2021 ("First Manzari Report," Doc. No. 119-2), and contains five opinions:

(1)    Defective valve stem seals caused excessive oil consumption (id. at ¶¶ 40-48);

(2)    BMW concealed from consumers its knowledge that N63 engines suffer from defective valve stem seals (id. at ¶¶ 49-62);

(3)    Each of the subject vehicles suffers from defective valve stem seals which BMW did not remedy or resolve in a reasonable period of time (id. at ¶¶ 63-83);

(4)    The subject vehicles were not suitable for their ordinary purpose, which is providing safe and reliable transportation (id. at ¶ 84); and

(5)    The value of each of the subject vehicles is, or to a reasonable degree of technical certainty was, substantially reduced by defective valve stems seals (id. at ¶¶ 85-87).

On September 1, 2021, Manzari supplemented his First Report based on the deposition testimony of BMW's Technical Service Engineers, Erik Luchsinger and Richard Veren ("Second Manzari Report," Doc. No. 119-3). In his Second Report, Manzari concludes that BMW knew about the valve stems seals defect as early as 2012, but that its brochure to consumers instructing them to top the engine with 2 quarts of oil, and its Service Information Bulletin (SIB) 11 03 13 stating it is

normal for N63 engines to consume up to 1 quart of engine oil per 750 miles at any time, are technically inaccurate and misleading. (Id. at ¶¶ 11-12).

The Court notes that Manzari has been proffered by Plaintiffs for precisely the same opinions in other related actions, and BMW has moved to exclude for similar reasons. Yet courts have denied the motions in whole or in part. See, e.g., Bryant, 2022 WL 420874; Grover v. BMW of North America LLC, No. 1:19-CV-12, 2022 WL 205249 (N.D. Ohio Jan. 24, 2022); Mize v. BMW of North America LLC, No. 2;19-CV-7-Z-BR, 2021 WL 5571165 (N.D. Tex. Oct. 1, 2021); Carroll, 553 F. Supp. 3d 588; Baker v. BMW of N. Am., LLC, No. CV 20-274, 2021 WL 1577837, at *5 (E.D. La. Apr. 22, 2021); Harris v. BMW of North America LLC, No. 4:19-CV-00016, 2020 WL 7318087 (E.D. Tex. December 11, 2020). The Court has looked to many of these opinions for guidance.

### C.    Discussion

As a threshold matter, BMW argues that Manzari's opinions as they relate to Blumeyer's vehicle are inherently unreliable and must be stricken because they are premised on his vehicle having an N63 engine when in fact it was equipped with an N63T engine. (Doc. No. 119-1 at 3-5). The Court previously addressed the issue of the N63T engine in its denial of BMW's motion for leave to amend its answer, finding that any distinction between the two engines is one without a difference given that BMW's own corporate designee, Senior Product Engineer Michael Murray, previously testified in another N63 case[3] that the key defect at issue in this case – the faulty valve stem seals – is the same in both N63 and N63T engines and that BMW's service information bulletins and reports dealing with oil consumption apply equally to both types of engines. (Doc.

---

[3] In Harris v. BMW of North America, LLC, No. 4:19-CV-16 AL (E.D. Tex. Jan 6, 2022), the district court denied BMW leave to amend its answer – filed on the eve of trial – to plead that the vehicle at issue had an N63T engine as opposed to an N63 engine.

No. 151). BMW argues that Plaintiffs have taken Murray's testimony out of context and points to the report of its expert Terry Hutchinson wherein he states that "[t]he N63T engine is a technically updated version of the N63 with several updates to the various mechanical and electrical systems" and "is not considered the same engine as the N63[.]" (Hutchinson Expert Report, Doc. No. 119-5).

An expert must have a reasonable factual basis for his testimony and his conclusions must be based on reliable methods. See Fed. R. Evid. 702, 703; Daubert, 509 U.S. at 589. Prior to reaching his conclusions in this case, Manzari reviewed numerous materials, as stated in his June 22, 2021 Report, including service and warranty information for Plaintiffs' vehicles, a series of BMW measures and service information bulletins concerning oil consumption issues, a Consumer Report study on excessive oil consumption, and his own experience with the design, function, and operation of the N63 engine. (First Manzari Report at ¶ 15). These documents provide the basis for Manzari's conclusions.

As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility. See Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2002). To the extent BMW is challenging the factual basis for Manzari's opinions, that is a matter for cross-examination at trial. Sphere Drake Ins. PLC v. Trisko, 226 F.3d 951, 954-55 (8th Cir. 2000). To be sure, when an expert's factual basis is too far afield of the facts of the case, it must be excluded. See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000) ("[E]xpert testimony must not only be based on reliable science but must also 'fit' the particular facts of the case."). But BMW has not shown here "that there is simply too great an analytic gap between [the N63T engine] and [Manzari's opinion]." Id. (quoting General Elec. Co. v. Joiner,

522 U.S. 136, 146 (1997)). Therefore, BMW's motion to exclude the entirety of Manzari's opinions as they relate to Blumeyer's vehicle will be denied.

The Court will now address each of Manzari's opinions in turn.

**(1)     Defective valve stem seals caused excessive oil consumption**

In his first opinion, Manzari concludes that the cause of excessive oil consumption in BMW N63 Engines was due to defective valve stem seals, as evidenced by SIB B11 08 15, which lists various symptoms produced by defective valve stem seals, such as smoke from the tailpipe when starting or aggressively accelerating and decelerating the engine; excessive engine oil consumption; and spark plugs fouled with engine oil. (First Manzari Report at ¶¶ 40, 48). BMW contends that Manzari's opinion is based on a "faulty understanding" of SIB B11 08 15, which states that one can only conclude the valve stem seals are defective when one of the three symptoms is present *and* other potential causes have been exhausted. (Doc. No. 119-1 at 17-18).

As other federal district courts have found, this is not inconsistent with Manzari's methodology. Manzari does not state in his report that defective valve stem seals existed simply due to the presence of one of the three symptoms. Rather, he based his conclusion on service records, videos, a Consumer Report study, BMW's own internal reports, and his own experience working with automobiles and the N63 engine. (First Manzari Report at ¶ 15). BMW's complaint is primarily that it disagrees with Manzari's conclusion, but this does not show that the methodology he employed to reach his conclusion was unreliable. See Bryant, 2022 WL 420874, at *3; Grover, 2022 WL 205249, at *8; Mize, 2021 WL at *2-3; Harris, 2020 WL 7318087, at *3-4. BMW's motion to exclude this opinion will be denied.

**(2)     BMW concealed from consumers its knowledge that N63 engines suffer from defective valve stem seals**

In his second opinion, Manzari concluded that despite knowing as early as 2012[4] that defective valves stem seals cause excessive consumption of engine oil, BMW concealed this knowledge from Plaintiffs and other customers by: (1) instructing its dealers to tell Plaintiffs and other customers that this exorbitant 1 quart per 750 miles amount of oil consumption was considered normal, and issued bulletins to that effect, or in BMW AG words "argumentation aid" advising dealers how to convince customers excessive oil consumption in their cars was purportedly "normal;" (2) instructing dealers to overfill engines with oil during oil service by issuing the new recommended refill specification of 10 quarts, up by 1 quart from the previous specification of 9 quarts; (3) instructing dealers to overfill engines with oil whenever vehicle displays a message to "add engine oil" or whenever engine oil level is low, by issuing an instruction to add 2 quarts of oil to then engine instead of 1 quart; (4) shortening the oil service interval from the earlier of 15,000 miles or two years to the earlier of 10,000 miles or one year; and (5) discouraging its dealers from providing a customer with a record of an oil consumption complaint as evident from SIB 01 16. (First Manzari Report at ¶ 62).

BMW contends this is not an expert opinion but rather a comment on the evidence and conclusion of law that is improper under the Federal Rules of Evidence and Daubert. (Doc. No. 119-1 at 8-9). Plaintiffs argue that under FRE 702(a), Manzari may use his scientific, technical, or other specialized knowledge to help the trier of fact understand whether BMW concealed from consumers that the N63 engine suffered from defective valve stem seals. (Doc. No. 123 at 12).

A number of courts in related cases have determined that Manzari's concealment opinion is not an improper conclusion of law because it does not reach the ultimate legal question. In other

---

[4] In his First Report, Manzari opined that BMW knew as early as February 2013 that defective valves stem seals cause excessive consumption of engine oil. (First Manzari Report at ¶ 62). In his Second Report, Manzari opined that BMW knew about the valve stems seals defect as early as 2012.

words, "Manzari offers his expert opinion – reached after considering documents and applying the information contained in the documents to his knowledge and experience – on a hotly contested fact issue that the jury will ultimately have to determine." Mize, 2021 WL 5571165, at *7 (quoting Harris, 2020 WL 7318087, at *4). Likewise, in Bryant, 2022 WL 420874, at *3, the court found Manzari's opinions and testimony could help the jury determine a question of fact on which the average juror lacks technical and specialized knowledge, i.e., whether BMW misled consumers and concealed its knowledge of an alleged valve stem seal defect in N63 engines. Compare Carroll, 553 F. Supp. 3d at 609, where the court excluded Manzari's opinion, concluding it was based not upon Manzari's technical or specialized knowledge, but rather his own conclusions and "gloss" on certain facts regarding what BMW knew and when it knew it.

The Court is persuaded by the reasoning of the Mize and Bryant courts and agrees that whether BMW concealed from consumers its knowledge that the N63 engines suffer from defective valve stems is a question of fact on which Manzari may properly opine. The deficiencies raised by BMW can be addressed through vigorous cross examination. BMW's motion to exclude this opinion will be denied.

### (3) Each of the subject vehicles suffers from defective valve stem seals which BMW did not remedy or resolve in a reasonable period of time

In his third opinion, Manzari concluded that each of the Subject Vehicles suffers from defective valve stem seals which BMW did not remedy or resolve in a reasonable period of time. (First Manzari Report at ¶¶ 63-83). He asserts that photographs and video recordings of the Subject Vehicles "show presence of oil inside combustion chambers and that spark plugs are fouled with oil," and show "smoke from the tailpipe when aggressively accelerating and decelerating the engine," which "[i]n his expert opinion … "[i]ndicate presence of oil in the engine's combustion chambers consistent with entry through the intake valves." (Id. at ¶¶ 69, 81). According to Manzari,

the oil consumption exhibited by Plaintiffs' BMW vehicles demonstrates that the valve stems seals in their vehicles are defective. (Id. at ¶¶ 70, 82). Manzari further opines the valve stem seals in Plaintiffs' vehicles were defective when their vehicles were sold new given that the seals are "designed to last the life of the engine" and are "not a maintenance item." (Id. at ¶¶ 71, 83). He notes that BMW's Service and Warranty Information Booklet provides no defined interval for servicing, maintaining, or replacing valve stem seals. (Id.).

BMW argues Manzari's opinion is unreliable because he has no "automotive design" experience pertaining to valve stem seals and the evidence he relied upon was insufficient to conclude that valve stem defects existed at the point of sale. (Doc. No. 119-1 at 12-16). BMW also takes issue with the fact that Manzari never personally inspected Plaintiff's vehicles, let alone N63 engines at large. (Id. at 17). Plaintiffs respond that Manzari is clearly qualified by his vast knowledge and experience in the automotive industry to opine on the engines in Plaintiffs' cars and that he arrived at his opinions by applying that knowledge and expertise to his analysis of Plaintiffs' complaints and BMW's internal documents, information service bulletins, and opinions regarding excessive oil consumption in N63 engines. (Doc. No. 123 at 19-20).

BMW's argument that Manzari is not an expert in automotive design was previously rejected in Carroll, 553 F. Supp. 3d 558. There, the court held that such an argument misses the point, given Manzari's vast experience repairing and diagnosing vehicles and familiarity with the N63 engine. Id. at 608. Further, in addition to BMW reports and bulletins and the deposition testimony of BMW's senior product engineer Michael Murray, Manzari examined various documents pertaining to Plaintiffs' vehicles, including repair and warranty history, purchase records, and service records. Manzari also considered Plaintiffs' declarations, and the photographs and video recordings of the subject vehicles and their engines. (First Manzari Report at ¶ 15).

Courts in related cases have held that Manzari's application of his experience and knowledge to his review of these documents is a reliable methodology that withstands BMW's request for exclusion. See Harris, 2020 WL 7318087, at *5 (concluding that "Manzari utilized a reliable methodology in reaching his conclusion – namely, coupling his experience and knowledge with a review of various internal documents"); see also Grover, 2022 WL 205249, at *8 ("The Court is satisfied at this juncture that, having specifically identified the documentation upon which he applied his knowledge and experience and the reasoning supporting his opinion, Manzari's methodology is sufficiently reliable to satisfy the Court's gatekeeping function."); Bryant, 2022 WL 420874, at *3 ("To reach this conclusion, Manzari relied upon the presence of symptoms of defects, photos, videos, and his own extensive knowledge … There is nothing unreliable about this conclusion; it is simply a conclusion that BMW disagrees with."); Mize, 2021 WL 5571165, at *4. If BMW finds Manzari's opinion lacking, it may cross examine him on that issue at trial.

Finally, BMW's argument that Manzari's opinions are not reliable because he did not personally inspect Plaintiffs' vehicles is unavailing. See Daubert, 509 U.S. at 592 ("Unlike an ordinary witness … an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."); Grover, 2022 WL 205249, at *7 (rejecting this argument). BMW's motion to exclude this opinion will be denied.

### (4)    The subject vehicles were not suitable for their ordinary purpose

In his fourth opinion, Manzari opined that the Subject Vehicles were not suitable for their ordinary purpose, which is providing safe and reliable transportation. Manzari explains that when a vehicle consumes excessive oil, the driver runs the risk of running the vehicle too low on oil, thereby causing major damage. He states that the Subject Vehicles' Owner Manual or Service and Warranty Information does not explain the necessity of adding oil to these engines in between

- 11 -

regular services or that it is normal for the engine to consume 1 quart of oil per 750 miles and that owners should add 2 quarts of oil regularly between the oil changes once a message calling to add engine oil appears. (First Manzari Report at ¶ 84).

BMW argues that Manzari's opinion is unreliable because, although he states that excessive oil consumption endangers a car's engine, there is no evidence in the record that the subject vehicles were at risk of running out of oil or suffering an engine failure. (Doc. No. 119-1 at 19). BMW further argues that Manzari is unqualified to give a "design opinion," citing <u>Smith v. Ford Motor Co.</u>, 882 F. Supp. 770, 772 (N.D. Ind. 1995), for support. (<u>Id</u>.). In <u>Smith</u>, the court held that an auto mechanic was not qualified to testify regarding the design of the fuel and electrical systems of a particular type of truck.

As discussed above, the Court has already determined that Manzari is qualified by virtue of his knowledge and experience to testify on the functioning of the vehicles' engines. As for Manzari's methodology, courts in related cases have consistently held this identical opinion to be both reliable and relevant. <u>See</u> <u>Bryant</u>, 2022 WL 420874, at *4; <u>Mize</u>, 2021 WL 5571165, at *5-6; <u>Harris</u>, 2020 WL 7318087, at *7. BMW's motion to exclude this opinion will be denied.

**(5)    The value of each of the subject vehicles is, or to a reasonable degree of technical certainty was, substantially reduced by defective valve stems seals**

In his fifth and final opinion, Manzari opined that the value of each of the Subject Vehicles is, or to a reasonable degree of technical certainty was, substantially reduced by defective valve stems seals. (First Manzari Report at ¶¶ 85-86). He offers the opinion that "where the cost of replacing valve stem seals approaches the cost of replacing the engine, as is the case with these N63 engines, a more prudent approach is to replace the engine." (<u>Id</u>. at ¶ 87). Manzari then notes that replacing the engine is "a repair that [BMW] itself originally recommended." (<u>Id</u>.). Manzari relied on estimates from BMW dealerships to conclude that the cost of replacement is

approximately $12,500 to $15,000. (Id.). BMW argues Manzari's opinion is unreliable because he has not provided sufficient facts or methodology for opining that the remedy for the alleged valve stem seal defect is to replace the engine, at a cost of between $12,500 and $15,000. (Doc. No. 119-1 at 20-21).

First, Manzari's knowledge and experience in the automotive repair business qualifies him to opine regarding alternative automotive repair options and price ranges for those repair options. And as he points out in his opinion, BMW itself has recommended engine replacement to correct high rates of oil consumption. Grover, 2022 WL 205249, at *10. In addition to his experience and knowledge regarding alternative automotive repair options and costs thereof, Manzari considered the cost of engine replacement provided by several BMW dealerships. That said, as BMW notes, Manzari's opinion did not differentiate between the costs of parts and labor, to arrive at his estimated range for repair costs.

Nevertheless, as the Grover court concluded, Manzari's knowledge and experience in the automotive repair industry, and citation to evidence in the record to support his opinion regarding engine replacement and the costs thereof, is a sufficiently reliable methodology to satisfy the Court's gatekeeping function. See id. See also Bryant, 2022 WL 420874, at *4 (same). To the extent that BMW seeks to challenge the underlying factual bases for Manzari's opinion, those facts may be tested by BMW at trial. BMW's motion to exclude this opinion will be denied.

## IV.    Motion for summary judgment[5]

## A.    Facts[6]

---

[5] BMW has requested oral argument on its motion. After a review of all the briefing, the Court finds oral argument is unnecessary and denies BMW's request.

[6] The facts are taken from BMW's Statement of Material Facts ("SOF," Doc. No. 118-2) and Plaintiffs' Statement of Additional Material Facts ("PSAMF," Doc. No. 126) and are not in dispute except where so noted.

On October 9, 2012, Blumeyer purchased a new 2013 BMW 750li for $94,965.00.[7] (PSAMF at ¶ 16; SOF at ¶ 43). At the time of sale, Blumeyer's vehicle was covered by BMW's NVLW that expired on September 29, 2016. (PSAMF at ¶ 17). In November 2012, Blumeyer told a BMW dealer in Florida that his car burned a lot of oil, and the dealer responded, "That's the way it is now with these cars." (PSAMF at ¶ 18). In May 2013, Blumeyer mentioned to Plaza BMW that his car burned oil and was told that "this is the way it is." (Id.). During that same visit, Plaza BMW told Blumeyer that when the low oil light came on telling him to add one quart of oil, he should add two quarts of oil instead. (Id.).[8] Blumeyer states that whenever the oil light came on, he had the dealer add oil, or he added oil to the car himself, which was two quarts every 2,000 miles. (PSAMF at ¶ 21). Additional facts will be discussed as necessary to address the parties' arguments.

## B.   Legal standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The initial burden is placed on the moving party.  City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988).  If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that

---

[7] BMW states the sale price of Blumeyer's vehicle was $89,985.00.

[8] BMW disputes Blumeyer's statements as inadmissible hearsay.

logically can be drawn from those facts. The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. <u>Osborn v. E.F. Hutton & Co., Inc.</u>, 853 F.2d 616, 619 (8th Cir. 1988).

### C.    Discussion

In support of its motion, BMW first argues that Blumeyer's cause of action fails because his vehicle has an N63T engine while his complaint is premised on the alleged defects of the N63 engine. Alternatively, BMW argues that Plaintiffs' claim of fraudulent concealment tolling fails because it is dependent on the facts and history concerning the N63 engine, not the N63T engine, and without any facts concerning fraudulent concealment of the N63T engine, Blumeyer cannot toll the applicable statute of limitations in this case. Lastly, BMW argues that Blumeyer has failed as a matter of law to show any breaches of warranty concerning his vehicle as there is no evidence that BMW ever refused or did not perform warranty service on the vehicle and no competent evidence of a defect in the vehicle at the time it was sold.

### (1)    N63T engine

BMW's argument regarding the N63T engine is unavailing. As discussed above, Section II. C., BMW's own corporate designee, Senior Product Engineer Michael Murray, testified that the faulty valve stem seals are identical in both N63 and N63T engines and that BMW's service information bulletins and reports dealing with oil consumption apply equally to both types of engines. (<u>See</u> Doc. No. 127-2 at 23:20-24:9). BMW argues that Murray's testimony has been taken out of context and points to the report of its expert Terry Hutchinson, who concludes that the N63T engine is not considered the same engine as the N63. (Doc. No. 119-5). Whether the N63 and N63T engines are essentially the same is a question of fact for a jury to decide. <u>See</u> <u>Bryant</u>, 2022 WL 432501, at *6 (citation omitted) ("[I]n a case of dueling experts … it is left to the trier of fact

… to decide how to weigh the competing expert testimony."). <u>See also</u> <u>Rutherford</u>, 2022 WL 80498, at *8 (rejecting BMW's argument that plaintiff could not take advantage of class-action tolling because his vehicle was equipped with an N63TU engine, whereas the <u>Bang</u> class was comprised only of consumers whose vehicles contained N63 engines). Accordingly, BMW's motion for summary judgment will be denied on these grounds.

**(2)     Statute of limitations and tolling**

The parties do not dispute that the four-year statute of limitations applicable under Missouri law for breach of warranty claims governs Blumeyer's MMWA and state law claims. <u>Owen v. Gen. Motors Corp.</u>, 533 F.3d 913, 918-19 (8th Cir. 2008) (citing Mo. Rev. Stat. § 400.2-725); <u>Pollard v. Remington Arms Co., LLC</u>, No. 13-0086-CV-W-ODS, 2013 WL 3039797, at *6 (W.D. Mo. June 17, 2013). The limitations period begins to run when tender of delivery is made unless the goods are sold with a warranty for future performance.[9] <u>Pollard</u>, 2013 WL 3039797, at *6. If goods are sold with a warranty for future performance, then "the cause accrues on and the statute of limitations runs from the date on which the defect was or should have been discovered." <u>Id.</u> (quoting <u>Ouellette Machinery Systems, Inc. v. Clinton Lindberg Cadillac Co.</u>, 60 S.W.3d 618, 621 (Mo. Ct. App. 2001) (citing Mo. Rev. Stat. § 400.2-725(2)). The discovery rule does not, however, extend the life of an express warranty beyond its terms. At the latest, the cause of action begins to accrue on the date when the express warranty expires. <u>See</u> <u>Owen</u>, 533 F.3d at 918-19. On this basis, the latest Blumeyer's cause of action for breach of express warranty could accrue would be September 29, 2016, when the NVLW for his car expired (PASMF at ¶ 17), and the latest he could assert his claim would be four years later, on September 29, 2020. Because Blumeyer filed this lawsuit in February 2019, his claims for breach of express warranty are not time-barred.

---

[9] In its motion, BMW acknowledges that a limited warranty like its NVLW is a warranty for future performance. (Doc. No. 118-1 at 15).

The future performance exception does not apply to breaches of implied warranty. See May, 812 F. Supp. at 944. Thus, a cause of action for breach of implied warranty accrues on the date of purchase and is time-barred four years thereafter. Blumeyer's complaint was filed more than four years after he purchased his vehicle on October 9, 2012. Thus, his claim for breach of implied warranty is time-barred unless a tolling doctrine applies.

As for claims for violation of the MMPA, there is no dispute that the five-year statute of limitations in Mo. R.S. § 516.120(2) applies. Huffman v. Credit Union of Texas, 758 F.3d 963, 967 (8th Cir. 2014) (citing Ullrich v. CADCO, Inc., 244 S.W.3d 772, 778 n. 3 (Mo. Ct. App. 2008)); Owen, 533 F.3d at 921 n. 6. What is disputed is when the statute of limitations begins to run. This limitation period begins to run from the time "a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." Levitt v. Merck & Co., Inc., 914 F.3d 1169, 1171-72 (8th Cir. 2019) (quoting Powel v. Chaminade Coll. Preparatory, Inc., 197 S.W.3d 576, 582 (Mo. 2006)). If, as BMW contends, the five-year statute of limitations expired five years after the date of purchase, then Blumeyer's MMPA claim is time-barred unless a tolling doctrine applies.

Blumeyer contends the applicable statute of limitations periods were tolled under the fraudulent concealment and class action[10] tolling doctrines. (Doc. No. 149-1 at 6-7). To establish fraudulent concealment and toll the applicable statutes of limitations, "[t]he concealment must be fraudulent or intentional and, ... there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." Pollard, 2013 WL 3039797, at

---

[10] In 2015, a nationwide class action was filed against BMW for BMW's alleged failure to repair vehicles equipped with defective N63 engines. See Bang v. BMW of N. Am. LLC, No. CV 15-6945 (D.N.J.). Both Blumeyer and Loy were putative members of the Bang class but opted out of the class settlement and brought this action.

*7 (quoting Owen, 533 F.3d at 919-20). The fraudulent concealment "must be something more than mere silence on defendant's part ...; usually the employment of some means or device to prevent discovery should be shown." Id. (quoting Gilliam v. Gohn, 303 S.W.2d 101, 107 (Mo. 1957)). Silence becomes misrepresentation only when there is a duty to speak, such as "when one of the parties has superior knowledge or information not within the fair and reasonable reach of the other party." Id. (quoting Bohac v. Walsh, 223 S.W.3d 858, 864 (Mo. Ct. App. 2007)). Blumeyer points to two bases for applying the fraudulent concealment doctrine: (1) BMW's internal documents and reports (Doc. No. 149-1 at 10-16); and (2) statements by BMW-authorized dealers that excessive oil consumption was "normal" (id. at 16-19).

Plaintiffs have offered evidence that BMW began receiving complaints of excessive oil consumption in 2009 and 2010 and took systemic efforts to interfere with consumers' ability to detect the problem. (Doc. No. 149-1 at 10-16). For example, in 2011, BMW AG issued to BMW a "measure" that fashioned a checklist of possible causes of oil consumption complaints and proposed fixes that included: (i) running additional tests to confirm the measure of oil consumption; (ii) replacing crankcase breather hoses and air filter elements; (iii) performing compression tests; and (iv) repeated consultations with technical support in search of additional fixes. BMW's Technical Service Engineer Artun Bolat admitted that as early as 2012 BMW knew that valve stem seals in N63-series engines were defective where they were getting hard and allowing oil to escape into the engine. Another Technical Service Engineer Richard Veren explained that the valve stem seals were wearing down prematurely, and "becoming hard," in turn allowing oil to escape into the combustion chamber. On February 26, 2013, BMW Senior Product Engineer Michael Murray created and submitted to BMW AG a report identifying worn and leaking valve stem seals as the cause of oil consumption complaints with a recommendation to

- 18 -

replace those parts if all other reasons for oil consumption were exhausted.

Despite having identified defective valve stem seals as the major cause of excessive oil consumption in the N63 engine, BMW did not acknowledge there was a problem. Instead BMW concealed and misrepresented the true condition of the N63 engine and the underlying cause of the excessive oil consumption by, *inter alia*, publishing SIB B11 01 13 to its dealers in April of 2013 to provide guidance on how best to respond when customers complained about the excessive oil consumption – with the goal of convincing the customer that in fact the oil consumption rate was "normal"; publishing SIB B01 16 15 which instructed the dealers not to open repair orders when adding oil to the N63 engines, allowing BMW to conceal the scope of the problem; overfilling N63 engines with ten (10) quarts of oil instead of the specified nine (9) quarts whenever the vehicle came in for a full oil change and shortening the oil service interval from the earlier of 15,000 miles or two (2) years to the earlier of 10,000 miles or one year. In addition, Blumeyer testified on deposition that he raised concerns about his car's excessive oil consumption with BMW-authorized dealerships during the warranty period and was told the oil consumption was normal. (PSAMF at ¶¶ 18, 19, 21).

Like other federal district courts have found in related cases on similar record evidence, this Court finds that questions of fact remain in dispute concerning when the plaintiffs learned of the defective valve stem seals, triggering the statute of limitations. See Hurley, 2021 WL 582291, at *4; Grover, 2022 WL 204925, at *13-14; Harris, 2020 WL 7074879, at *6-7; compare Carroll, 553 F. Supp. 3d at 614-615 (finding BMW's reports and bulletins addressing various causes of oil consumption did not demonstrate active concealment).

BMW argues the limitations period cannot be tolled based on fraudulent concealment because alleged statements by its dealers that oil consumption in the subject vehicles was normal

for an N63 engine cannot be attributed to BMW as there is no agency relationship between BMW and its dealers. (Doc. No. 118-1 at 21). While it is generally true that dealerships are not the agent of the manufacturer, as BMW points out, see State ex rel. Bunting v. Koehr, 865 S.W.2d 351, 354 (Mo. 1993), Missouri follows the Restatement of Agency rule that apparent authority exists to the extent it is reasonable for a third person dealing with the agent to believe the agent is authorized. Graue v. Missouri Prop. Ins. Placement Facility, 847 S.W.2d 779, 783 (Mo. 1993) (citing Restatement (Second) of Agency § 8 (1958); Jeff-Cole Quarries, Inc. v. Bell, 454 S.W.2d 5, 13 (Mo. 1970)). "When a person's conduct is such that it is reasonable to believe the person has authority to act for another, and the other has reason to know of such conduct and allows it, a third person may reasonably conclude that the conduct is authorized." Id. (citing Utley Lumber Co. v. Bank of the Bootheel, 810 S.W.2d 610, 612 (Mo. Ct. App. 1991)). See also Egmatic v. Nguyen, 113 S.W.3d 659, 672 (Mo. Ct. App. 2003); Bluehaven Funding, LLC v. First Am. Title Ins. Co., 594 F.3d 1055, 1058-59 (8th Cir. 2010) ("A principal is responsible for its agents' acts and agreements that are within the agent's authority, whether the authority is actual or apparent.").

Here, it is undisputed that BMW's warranties specifically instructed car owners to take their cars to authorized BMW centers to obtain repairs. (PSAMF at ¶ 83). Further, BMW's corporate designee, Michael Murray, testified that BMW provided its dealers with specific directions, recommendations, and instructions on what should be communicated to consumers during warranty repairs and expects its dealers to follow those instructions. (Id. at ¶¶ 77-82). BMW issued service bulletins to dealers concerning oil consumption issues with respect to the N63 engine stating that the oil consumption was "normal" for a high performance, turbo-charged engine like the N63. (Id. at ¶¶ 2, 18-19, 47-52, 63-65, 67-68).

Whether an agency relationship exists is generally a factual question for the jury. West v.

Sharp Bonding Agency, Inc., 327 S.W.3d 7, 11 (Mo. Ct. App. 2010). Based upon the record evidence, "the Court concludes that there is a genuine dispute of material fact that must be resolved by the factfinder as to whether BMW dealerships are agents of BMW for purposes of warranty repair." Grover, 2022 WL 204925, at *4.

The Court also finds the evidence advanced by both sides on the issue of concealment is sufficient to raise a genuine issue of material fact as to Blumeyer's diligence in discovering the alleged defect during the limitations period. See Harris, 2020 WL 7074879, at *6-7 (given the dealer's explanation that it was "normal" for plaintiffs' cars to burn oil, they had no reasons to search the internet for complaints regarding the N63 engine and did not become aware of such complaints within the limitations period; this is sufficient on summary judgment to support their contention that they exercised reasonable diligence); Grover, 2022 WL 204925, at *14 (citing Harris) (same).

Therefore, when viewing the record in the light most favorable to Blumeyer and resolving all reasonable doubts in his favor, as is required at the summary judgment stage, the Court finds there are genuine issues of material fact as to fraudulent concealment tolling. As such, BMW's motion for summary judgment will be denied on statute of limitations grounds. Because the Court finds that a genuine issue of material fact exists as to fraudulent concealment tolling, it need not address class action tolling. See Harris, 2020 WL 7074879, at *5.

**(3)    Merits**

BMW's summary judgment briefing is specifically directed at the merits of Loy's claims, not Blumeyer's. But even if the Court considered BMW's arguments as directed against Blumeyer's claims, the record is clear that the merits of those claims involve genuine issues of material fact that cannot be resolved at the summary judgment stage.

**Breach of express warranties (Claims 1 and 3)**

Blumeyer's vehicle was covered under BMW's NVLW, which warrants the subject vehicle against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser for a period of 4 years or 50,000 miles, whichever occurs first, and provides the following coverage:

> To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW center in the United States … during normal business hours.
>
> The authorized BMW center will, without charge for parts and labor (including diagnosis), either repair or replace the defective part(s) using new or authorized remanufactured parts.

(SOF at ¶ 41). Blumeyer alleges that by failing to repair the oil consumption defect in his vehicle during the warranty period when he complained about his car's excessive oil consumption, BMW breached its express warranty promising to repair or replace defective components for 4 years or 50,000 miles under its NVLW.

It is undisputed that BMW's warranties specifically instructed car owners to take their cars to authorized BMW centers to obtain repairs. (PSAMF at ¶ 83). Further, BMW's corporate designee Michael Murray testified that BMW provided its dealers with specific directions, recommendations, and instructions on what should be communicated to consumers during warranty repairs and expects its dealers to follow those instructions. (Id. at ¶¶ 77-82). BMW issued service bulletins to dealers concerning oil consumption issues with respect to the N63 engine stating that the oil consumption was "normal" for a high performance, turbo-charged engine like the N63. (Id. at ¶¶ 2, 18-19, 47-52, 63-65, 67, 68).

Moreover, Plaintiffs' expert, Darren Manzari, noted that Blumeyer was told by BMW dealerships during the warranty period (in 2012 and 2013) that oil consumption in his car was "par

for the course" and offered to top the oil up when needed. According to Blumeyer, he was adding one quart of oil for every 1,000 miles in between oil changes while his car was under warranty. The subject vehicle's service and warranty claim history reflect that in March 2014, in response to Blumeyer's concern over oil consumption, the BMW dealership replaced cranks case vent valves, but found no external leaks. In February 2016, the BMW dealership replaced vent pipes and vent valves. In June 2016, the dealership found upper oil pan gasket leaking and replaced it, finding no other leaks. In October 2017, after the NVLW had expired, Plaza BMW replaced both turbochargers. Blumeyer stated that prior to August 2018 his car was still consuming oil. He took the car in in August of 2018 because the car lacked power. In August-September 2018, Plaza BMW replaced the vehicle's engine. (First Manzari Report at ¶¶ 73-80).

Manzari also reviewed photographs and video of Blumeyer's car and noted the photographs showed presence of oil inside combustion chambers and that spark plugs were fouled with oil, and that video recording showed smoke from the tailpipe when aggressively accelerating and decelerating the engine. (Id. at ¶ 81). Manzari opined that the photographs and video recording indicated the presence of oil in the engine's combustion chambers consistent with entry through the intake valves. (Id.). He further opined that the oil consumption exhibited by Blumeyer's vehicle was excessive and demonstrated that the valve stem seals in his vehicle were defective when the vehicle was new and are now defective in the replacement engine. (Id. at ¶¶ 82-83).

When viewing the record in the light most favorable to Blumeyer, and drawing all legitimate inferences in his favor, a jury could reasonably determine that the N63 engines were defective, and that BMW breached its express warranty by failing to repair or replace them. BMW's motion for summary judgment will be denied as to Blumeyer's first and third causes of action.

**Breach of implied warranty (Claim 2)**

In his second claim, Blumeyer alleges BMW breached the implied warranty of merchantability under the MMWA and Mo. Rev. Stat. § 400.2-314 when it sold him a vehicle that was not in a merchantable condition. As discussed above, the Court has found that based on the record evidence presented, a jury could reasonably determine that the valve stem seals in the N63 engines were defective at the time of sale. Citing Hope v. Nissan North America, Inc., 353 S.W.3d 68, 90 (Mo. Ct. App. 2011), BMW argues that the implied warranty of merchantability can only be breached when the vehicle manifests a defect that renders it unfit for its ordinary purpose of providing transportation.

Plaintiffs' expert Darren Manzari opines that the Subject Vehicles were not suitable for their ordinary purpose, which is providing *safe and reliable* transportation. (Emphasis added). (First Manzari Report at ¶ 84). He explains the reason for this is that when a vehicle consumes excessive oil, the driver runs the risk of running the vehicle too low on oil, causing major damage and/or becoming stranded. He also notes that Blumeyer was adding oil to his engine in between services, which is not a normal procedure. (Id.).

When viewing this record in the light most favorable to Blumeyer, and drawing all legitimate inferences in his favor, the Court finds a genuine issue of material fact as to whether the alleged defect renders the vehicle unfit for its ordinary purpose of providing safe, reliable transportation, which is what an ordinary user or purchaser would expect when he buys a car. The Court disagrees with the rationale in Schneider, 2022 WL 1310457, at *11, that the oil consumption issues, and periodic oil refills was at most an "inconvenience" to the plaintiffs. BMW's motion for summary judgment on this claim will be denied.

**Violation of MMPA (Claim 4)**

- 24 -

The MMPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise. Mo. Rev. Stat. § 407.020.1; Schulte v. Conopco, Inc., 997 F.3d 823, 826 (8th Cir. 2021). Here, Blumeyer claims BMW failed to disclose and actively concealed material facts about the N63 engine's excessive oil consumption and defective valve stem seals and attempted to convince him that his car's oil consumption was "normal." (Doc. No. 149-1 at 28).

The Court has found based on the record evidence presented that a jury could reasonably conclude that the valve stem seals in the N63 engines of the subject vehicles were defective at the time of sale. Whether statements made to Blumeyer by BMW authorized dealers can be attributed to BMW under agency principles for purposes of warranty repair is also a question of fact for a jury to decide. See Grover, 2022 WL 204925, at *4.

To the extent BMW contends that any such statement was made after the sale of the vehicle, and therefore cannot not constitute a "false and misleading representation about merchandise being sold" or be "made in connection with the purchase or lease" of the subject vehicles, the MMPA is clear that "[a]ny act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation." See Mo. Rev. Stat. § 407.020.1.

To the extent BMW contends there could be no concealment on its part considering its release, in May 2015, of SIB B11 08 15 regarding potential valve stem seal defects and replacement procedures (Doc. No. 118-1 at 31), there is contradictory evidence in the record. Again, BMW's own documents reflect that it knew of the problem with the valve stem seals but concealed/misrepresented those problems through its publications to dealers who then used those

publications to assure customers that their vehicles' oil consumption was normal.  A jury could, if it finds the evidence credible, find that BMW's actions violated the MMPA. BMW's motion for summary judgment on this claim will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant BMW of North America, LLC's Motion for Summary Judgment [118] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant BMW of North America, LLC's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Darren Manzari [119] is **DENIED.**

Dated this 29th day of June, 2022.

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**